**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JRB 2171 HWY 229, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | |
| **LENNOX AES HOLDINGS LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# COMPLAINT

COMES NOW Plaintiff JRB 2171 Hwy 229, LLC ("Landlord") and, for its Complaint against Defendant Lennox AES Holdings LLC ("Lennox AES"), states as follows:

## PARTIES

1. Landlord is an Alabama limited liability company. Landlord owns the real property commonly known as 2171 Alabama Highway 229 South, Tallassee, Elmore County, Alabama (the "Subject Property"). Its legal description appears in Exhibit A to the Lease described below. Landlord's member is Jason Benton who is domiciled in Alabama.

2. Defendant Lennox AES is a Delaware limited liability company. Lennox AES occupies and does business at the Subject Property. Lennox AES' sole member is Lennox Industries Inc., a Delaware corporation with its principal place of business in Richardson, Texas. (Pls.' Rule 7.1 Corporate Disclosure Statement (Doc. 17) ¶ 2, Lennox AES Holdings LLC v. Benton, No. 1:25-cv-00755-CFC (D. Del.)).

3. Jason R. Benton is Landlord's Manager.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The parties are citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. A limited liability company is a citizen of every State of which any of its members is a citizen. Landlord's member, Mr. Benton, is a citizen of Alabama, so Landlord is a citizen of Alabama. Lennox AES' sole member, Lennox Industries Inc., is incorporated in Delaware and has its principal place of business in Texas. 28 U.S.C. § 1332(c)(1). Lennox AES is therefore a citizen of Delaware and Texas.

6. The amount in controversy exceeds $75,000. The Short Term Items described below total $87,711. Landlord also seeks a declaration that replacement of the approximately 75,000-square-foot manufacturing roof is Lennox AES' obligation. AEI estimates the cost of that replacement alone at well beyond the $75,000.00 threshold for diversity jurisdiction. Alterations that Lennox AES' own capital proposal values at $227,500, and attorneys' fees under Sections 23 and 32(b) of the Lease.

7. This Court has authority to declare the parties' rights and obligations under the Lease under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

8. Lennox AES is subject to personal jurisdiction in Alabama. It leases and occupies real property in Elmore County, and the claims arise from its performance of a lease of that property. Fed. R. Civ. P. 4(k)(1)(A). Ala. R. Civ. P. 4.2(b).

9. Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2). The Leased Premises are located in Elmore County, which lies within the Northern Division of this

District, and a substantial part of the events giving rise to Landlord's claims occurred there. 28 U.S.C. § 81(b)(1).

## FACTS

### A. The Lease

10. Landlord and Lennox AES are parties to a Lease Agreement dated October 25, 2023 (the "Lease"). A copy of the Lease is attached as **Exhibit 1**. (Ex. 1 at 1).

11. Under the Lease, Landlord leases to Lennox AES the real property and improvements on a portion of 2171 Hwy 229, Tallassee, Alabama, described in Exhibit A to the Lease (the "Leased Premises"). (Ex. 1 at § 1 & Ex. A).

12. The Lease is a direct lease between Landlord and Lennox AES. Lennox AES did not take the Lease by assignment from another tenant. (Ex. 1 at 1).

13. The Lease term began on October 25, 2023, and runs for ten years. (Ex. 1 at § 2).

14. Lennox AES has occupied the Leased Premises continuously since October 25, 2023.

15. The parties negotiated specific covenants and agreed that the Lease "is an absolute net Lease." (Ex. 1 at § 3(c)). Section 3(c) further requires Tenant to pay all Rent and other charges "free from any charges, impositions, claims, damages, expenses, deductions, setoffs, counterclaims, abatement, suspension or defense of any kind." (Ex. 1 at § 3(c)). Section 3(d) requires that all Rent be paid "without demand, deduction or set-off." (Ex. 1 at § 3(d)).

16. Section 7 of the Lease places the maintenance, repair, and replacement of the Leased Premises on Lennox AES. It provides:

> Except as provided in Section 12 below, **Landlord shall have no obligation** to maintain, repair or replace all or any portion of the Leased Premises. **At its sole cost and expense**, Tenant shall maintain, repair and replace in good condition and repair all portions

> of the Leased Premises, including, without limitation, **the roof**, walls, foundation, structural and non-structural components, all interior painting, glass, doors, truck docks, truck pads, mechanical systems, HVAC systems, plumbing and electrical systems serving the Leased Premises, and Tenant shall keep the Leased Premises clean and free of debris, and Tenant shall maintain, repair and replace in good condition the parking lot and landscaping on the Leased Premises. If, after notice from Landlord, Tenant fails or refuses to make any repairs or provide any maintenance required of Tenant under this Lease, then Landlord shall have the right, but not the obligation, to cause to be performed such maintenance, repairs and replacements, in which event Tenant shall pay the full cost to Landlord upon demand as Additional Rent.

(Ex. 1 at § 7) (emphasis added).

17. Section 12 addresses fire and other casualty. No casualty is at issue here. (Ex. 1 at § 12).

18. Section 7 contains no exception for conditions that existed on the Commencement Date. (Ex. 1 at § 7).

19. In Section 9(a), Lennox AES acknowledged "that Landlord has not made any representation or warranty, express or implied, as to the physical condition . . . of the Leased Premises, except as expressly set forth herein." (Ex. 1 at § 9(a)).

20. Section 8(a) prohibits Alterations without Landlord's written approval of plans. It provides that "Tenant shall not permit structural or non-structural alterations or additions ('Alterations') in or to the Leased Premises, unless and until plans therefor have been **approved by Landlord in writing**." (Ex. 1 at § 8(a)) (emphasis added).

21. Section 8(a) further provides that, unless Landlord requires removal, "all such Alterations, except movable office furniture and equipment and trade fixtures, shall at Landlord's option become a part of the realty and the property of Landlord, and shall not be removed by Tenant." (Ex. 1 at § 8(a)).

22. Section 8(a) also provides that "Tenant hereby indemnifies and shall defend and save harmless Landlord from all costs, loss or expense in connection with any construction or installation of such Alterations." (Ex. 1 at § 8(a)).

23. Section 11(b) requires Lennox AES, "upon request," to "deliver to Landlord a certificate evidencing the existence and amount of the insurance required to be carried by Tenant under this Section 11." (Ex. 1 at § 11(b)).

24. Section 16(b) requires Lennox AES, "[w]ithin fifteen (15) days following receipt of a written request from Landlord," to execute and deliver an estoppel certificate certifying, among other things, the date to which Rent has been paid and whether there are any uncured defaults. (Ex. 1 at § 16(b)).

25. Section 16(b) further provides that "Tenant's failure to deliver such statement within such period shall be conclusive upon Tenant that this Lease is in full force and effect and unmodified and that there are no uncured defaults in Landlord's performance hereunder." (Ex. 1 at § 16(b)).

26. Section 20 gives Landlord and its agents "the right . . . during reasonable times, to enter the Leased Premises to examine them or to make any necessary repairs thereto required to be made hereunder." (Ex. 1 at § 20).

27. Under Section 17(a)(ii), an "Event of Default" occurs when "Tenant shall fail to perform or observe **any** term, condition, covenant or obligation as required under this Lease." (Ex. 1 at § 17(a)(ii)) (emphasis added). Section 17(a)(ii) contains no cure period.

28. Upon an Event of Default, Landlord may exercise its remedies "without further notice to or demand upon Tenant." (Ex. 1 at § 17(b)). Those remedies include the right to "re-enter

the Leased Premises and cure any default of Tenant," with Lennox AES to "reimburse Landlord as Additional Rent for any costs and expenses that Landlord thereby incurs." (Ex. 1 at § 17(b)(i)).

29. Section 17(b)(iv) provides that "Landlord may sue for injunctive relief or to recover damages for any loss resulting from the breach." (Ex. 1 at § 17(b)(iv)).

30. Landlord's remedies are cumulative, and "[n]o delay or omission to exercise any right or power accruing upon default shall impair any such right or power or shall be construed to be waiver thereof." (Ex. 1 at § 17(c)).

31. Section 26 provides that "[n]o term, covenant, or condition of this Lease shall be deemed to have been waived by a party unless such waiver be in writing by such party." (Ex. 1 at § 26).

32. Section 32(a) provides that the Lease "may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against whom such enforcement of such change, waiver, discharge or termination is sought." (Ex. 1 at § 32(a)). Section 32(d) likewise bars modification "except by an instrument in writing executed by the parties hereto." (Ex. 1 at § 32(d)).

33. Section 32(b) entitles the prevailing party in an action to enforce the Lease to "reimbursement for counsel fees and other expenses reasonably and actually incurred." (Ex. 1 at § 32(b)).

34. Section 23 requires Lennox AES to indemnify Landlord against "any and all losses, claims, liabilities, damages, demands, fines, costs and expenses (including reasonable legal expenses) of whatever kind and nature resulting from . . . Tenant's breach of the terms and provisions of this Lease." (Ex. 1 at § 23).

35. Section 3(e) imposes a late charge of five percent on any amount overdue by ten days and interest at ten percent per annum on any amount unpaid twenty days after it is due. (Ex. 1 at § 3(e)).

**B. The Property Condition Report**

36. In January 2026, AEI Consultants ("AEI") inspected the Leased Premises.

37. AEI issued a Property Condition Report dated February 6, 2026, AEI Project No. 521981 (the "PCR"). A copy of the PCR is attached as **Exhibit 2**. (Ex. 2 at 1).

38. The PCR identifies conditions requiring immediate attention ("Immediate Items") and conditions requiring attention within one year ("Short Term Items"). (Ex. 2 at 3–4).

39. AEI describes the manufacturing facility roof as approximately twenty-five-plus years old, in poor condition, with multiple reported leaks in various locations. (Ex. 2 at § 3.2.4).

40. AEI recommends that $6,000 be budgeted for emergency roof repairs until full replacement of the manufacturing roof is completed. (Ex. 2 at § 3.2.4).

41. AEI identifies the manufacturing facility roof, approximately 75,000 square feet, for replacement within the next one to three years. (Ex. 2).

42. The leaks in the manufacturing roof were reported to AEI by Lennox's on-site representative, Kevin Simmons. (Ex. 2).

43. A separate roof assessment by The Alsan Group dated January 15, 2026, documented prior ad hoc repairs to panel laps, screws, and exhaust-fan penetrations on the manufacturing roof, and ponding water at those penetrations.

44. The PCR identifies the following conditions requiring immediate or emergency attention, among others:

(a) Railings around the roof hatch, to provide fall protection at the roof hatch opening: $3,500. (Ex. 2 at § 3.2.4).

(b) Emergency repairs to the manufacturing facility roof, addressing reported leaks, panel laps, screws, and exhaust-fan penetrations: $6,000. (Ex. 2 at § 3.2.4). The PCR lists this item among its Short Term Items. Landlord's notices designated it an Immediate Item.

(c) Filling holes and replacing missing soil and vegetation around the main employee parking area, identified as possible trip hazards: $1,500. (Ex. 2 at § 3.1.4).

(d) Providing cover plates and securing exposed or damaged electrical conductors, including an exterior receptacle observed hanging from its box with exposed conductors: $1,000. (Ex. 2 at § 3.3.3).

45. The PCR identifies the following Short Term Items, among others:

(a) Site access, parking, and pavement (asphalt seal coating and crack fill, concrete sectional replacement, gravel refurbishment, concrete crack sealing, restriping): $54,711.

(b) Sidewalks, curbing, site steps, and ramps (concrete flatwork repair, curb sectional replacement, CMU replacement at the loading dock): $6,500.

(c) Cladding (exterior metal siding repair and replacement, exterior sealants, soffit sealant): $15,000.

(d) Manufacturing facility roof, balance of short-term repairs: $2,000.

(e) Administration office roof and recycling building roof maintenance and inspection: $2,000.

(f) Plumbing systems (sewer line jetting): $3,000.

(g) Doors and windows (glazing strip replacement): $1,500.

(h) Electrical systems (thermographic infrared testing): $3,000.

(Ex. 2 at 3–4). The Short Term Items total $87,711, excluding the $6,000 in emergency roof repairs described in Paragraph 44(b).

46. Every condition listed in Paragraphs 44 and 45 is located on the Leased Premises as described in Exhibit A to the Lease. Lennox AES has acknowledged that each Tallassee Immediate Item is on the Leased Premises. (See ¶ 82).

47. Since AEI's inspection, Lennox AES has not maintained the vegetation along the perimeter fence or in other areas of the Leased Premises. As of October 2026, vegetation had

overgrown the perimeter fence and those other areas. These conditions arose during Lennox AES' tenancy.

**C. Lennox AES' Unapproved Alterations**

48. The PCR discloses structural additions to the buildings on the Leased Premises that Lennox AES constructed after the Commencement Date. (Ex. 2).

49. Lennox AES' on-site representative told AEI that the Building 1 additions were completed in April 2025. (Ex. 2).

50. On information and belief, Lennox AES' own capital appropriation proposal describes the Alabama addition as a lean-to approximately 175 feet wide by 52 feet deep, or 9,100 square feet, with an estimated construction cost of $227,500.

51. Lennox AES never submitted plans for the Alterations to Landlord for approval.

52. Landlord never approved plans for the Alterations in writing.

53. No writing signed by Landlord waives or modifies Section 8(a).

54. Until December 31, 2024, Mr. Benton was employed by a Lennox affiliate as Vice President and General Manager of Lennox's AES business, with his office in the Tallassee facility.

55. In October 2024, while Mr. Benton was so employed, Lennox AES personnel exchanged internal communications about a proposed lean-to project. Mr. Benton was copied on and participated in some of those communications in his capacity as a Lennox employee.

56. On October 10, 2024, Lennox AES' Vice President of Finance, Chris Glass, wrote that Lennox AES should document the total cost of the lean-to and the new rent, and that both were at market, because Mr. Benton was "an employee and the landlord."

57. On November 27, 2024, Mr. Benton was copied, as a Lennox employee, on an e-mail containing preliminary drawings for the project. That e-mail is the last communication about the project that Mr. Benton has located.

58. Mr. Benton did not, on behalf of Landlord, approve plans for the Alterations, in writing or otherwise.

59. None of these internal Lennox AES communications was addressed to Landlord. None requested Landlord's approval, contained final plans or specifications, identified a contractor, or reflected a building permit. None is a written approval of plans by Landlord.

60. Lennox AES never proposed a rent increase for the Alterations to Landlord. Landlord never agreed to one, and Lennox AES has never paid one. Mr. Benton has located no communication from Lennox AES about the project after November 27, 2024. Lennox AES proceeded with construction without seeking Landlord's approval.

61. Lennox AES' capital proposal projected expenditures beginning January 1, 2025. Upon information and belief, construction of the Alterations began after Mr. Benton's employment ended on December 31, 2024, and was completed in or about April 2025.

**D. Landlord's Notices and Lennox AES' Response**

62. By letter dated March 10, 2026, sent by Federal Express to Lennox AES at its notice address under Section 27 of the Lease, Landlord gave Lennox AES written notice of default (the "March 10 Notice"). The March 10 Notice enclosed the PCR.

63. The March 10 Notice informed Lennox AES that it had made Alterations without Landlord's written approval of plans under Section 8. It demanded the building plans, specifications, the identity of the general contractor, and the construction permits within ten days of receipt.

64. The March 10 Notice also informed Lennox AES of its obligation under Section 7 to address the Immediate Items and Short Term Items identified in the PCR. It demanded proof of the Immediate Item repairs within thirty days of receipt.

65. The March 10 Notice further informed Lennox AES that the manufacturing roof requires replacement within the Lease term and that the cost is Lennox AES' under Section 7.

66. Lennox AES did not make the Immediate Item repairs within thirty days of receipt of the March 10 Notice. It did not produce the plans, specifications, contractor identity, or permits.

67. Lennox AES responded through counsel by letters dated March 20, 2026, and May 14, 2026. Lennox AES took the position that the conditions identified in the PCR either existed before October 25, 2023, or pertain to surrounding properties.

68. By letter dated August 26, 2026, Landlord gave Lennox AES further written notice under Section 7. The letter identified the Immediate Items and Short Term Items by description and cost and demanded that Lennox AES perform them (the "August 26 Notice").

69. In the August 26 Notice, Landlord exercised its option under Section 8(a) to treat the Alterations as part of the realty and the property of Landlord. Landlord also renewed its demand for the plans, specifications, contractor identity, and permits.

70. By separate letter dated August 26, 2026, Landlord requested that Lennox AES deliver a certificate of insurance under Section 11(b) and an estoppel certificate under Section 16(b).

71. On September 2, 2026, Lennox AES responded through its counsel, James V. Leito of Norton Rose Fulbright US LLP (the "September 2 Letter").

72. In the September 2 Letter, Lennox AES committed to perform only one item, the $1,500 landscaping repair. As to the roof hatch railings and the electrical items, Lennox AES stated

only that it would obtain bids within fourteen days and "then confer with Landlord on the nature of the remediation and allocation of responsibility."

73. The fourteen-day period Lennox AES gave itself to obtain bids expired on September 16, 2026. Lennox AES obtained no bid by that date.

74. As to the manufacturing roof, Lennox AES stated only that it intended "to inspect the roof to determine whether any specific leaks exist."

75. As to the Short Term Items, Lennox AES declined to commit to any work. It stated that it would "provide a further response within 45 days."

76. Lennox AES did not deny that it made the Alterations. It asserted that "[t]he alterations identified in the Letter were undertaken with Landlord's prior knowledge and approval."

77. Lennox AES did not produce any written approval by Landlord. It did not produce any plans, specifications, general contractor contract, or building permit for the Alterations.

78. The September 2 Letter did not respond to Landlord's requests for a certificate of insurance or an estoppel certificate. On October 27, 2026, after a further request, Lennox AES delivered certificates of liability insurance and evidence of property insurance for the policy period beginning July 1, 2026. It did not deliver the declarations pages Landlord requested or any evidence of the coverage it maintained from October 25, 2023, until the policy period shown on the certificate Landlord received in November 2025.

79. By e-mail dated October 2, 2026, Lennox AES' counsel produced bids dated September 23 through September 28, 2026, for the roof hatch railing, landscaping, electrical, and accessible-parking items. In that e-mail, counsel stated that Lennox AES would perform those items "at its own expense," while "reserving all rights (including the right to offset these amounts

from other future repairs)." Lennox AES continues to contend that those conditions "existed prior to Lennox's tenancy." None of the bids addresses the emergency repairs to the manufacturing roof.

80. By letter dated October 9, 2026, Landlord, through counsel, rejected Lennox AES' proposed deferral of the Short Term Items. It demanded completion of the Immediate Items, a written cure plan for the Short Term Items, Lennox AES' maintenance records, and the plans and permits for the Alterations. It also scheduled an inspection of the Leased Premises under Section 20 for October 12 through 16, 2026.

81. By letter dated October 23, 2026, Lennox AES responded through counsel to Landlord's October 9 letter (the "October 23 Letter").

82. In the October 23 Letter, Lennox AES stated that each Tallassee Immediate Item, including the manufacturing roof, "is on the leased premises." It stated that it would perform the roof hatch, landscaping, electrical, and accessible-parking items at its own expense and anticipated completing them by mid-November 2026.

83. As to the manufacturing roof, Lennox AES again stated only that it "intends to inspect the roof to determine whether any specific leaks exist" and, if any are found, "will confer with Landlord on the nature of the remediation and allocation of responsibility."

84. The October 23 Letter also stated Lennox AES' position on Section 7: "Although no similar Estoppel Certificate applies to the Tallassee facility, the same rationale holds. Section 7 of the Tallassee Lease imposes maintenance, repair, and replacement obligations on Tenant, but those obligations run to conditions and deterioration arising during the term of the Tallassee Lease—not to conditions inherited at the outset."

85. As to the Alterations, Lennox AES asserted that Mr. Benton "was authorized to act on behalf of Landlord" while employed by Lennox, and stated that it "does not concede that written

approval was never given or sought." Lennox AES has not produced any written approval by Landlord. Lennox AES also stated that it "will not contest that election at this time," referring to Landlord's election to treat the Alterations as Landlord's property, while reserving all rights.

86. Lennox AES stated that it would search for and produce the plans, contractor information, and permit records for the Alterations. It identified Scientific Engineering, Inc. as the general contractor for the Tallassee Alterations.

87. As of the filing of this Complaint, and on information and belief, Lennox AES has not performed the emergency repairs to the manufacturing roof and has not committed to perform them.

88. As of the filing of this Complaint, Lennox AES has not committed to perform the Short Term Items or delivered a plan for them. Lennox AES did not respond on the Short Term Items within the 45 days it set for itself in the September 2 Letter. In the October 23 Letter, Lennox AES stated that it would respond on the Short Term Items within seven days.

89. As of the filing of this Complaint, Lennox AES has not produced the plans, specifications or permits for the Alterations.

90. As of the filing of this Complaint, Lennox AES has not delivered an estoppel certificate.

91. Landlord has performed its obligations under the Lease.

## COUNT I
## Breach of Lease — Section 7 (Maintenance, Repair, and Replacement)

92. Landlord adopts and incorporates the allegations of Paragraphs 1 through 91 as if fully set out here.

93. The Lease is a valid and binding contract between Landlord and Lennox AES.

94. Section 7 obligates Lennox AES, at its sole cost and expense, to maintain, repair, and replace in good condition and repair all portions of the Leased Premises, including the roof, structural and non-structural components, plumbing and electrical systems, the parking lot, and the landscaping.

95. Lennox AES has failed to maintain, repair, and replace the Leased Premises as Section 7 requires. Its failures include, without limitation, the conditions identified in Paragraphs 44, 45, and 47 above.

96. Lennox AES' contention that a condition existed before October 25, 2023, is no defense. Section 7 is a continuing covenant that runs for the full term, contains no exception for pre-existing conditions, and states that Landlord "shall have no obligation to maintain, repair or replace all or any portion of the Leased Premises." Lennox AES acknowledged in Section 9(a) that Landlord made no representation about the physical condition of the Leased Premises, and Section 3(c) makes the Lease an absolute net lease.

97. Lennox AES' failure to perform Section 7 is an Event of Default under Section 17(a)(ii).

98. Landlord has been damaged by Lennox AES' breach. Its damages include the cost to perform the maintenance, repair, and replacement Lennox AES has failed to perform, the continuing deterioration of the Leased Premises, and Landlord's attorneys' fees and expenses recoverable under Sections 23 and 32(b).

WHEREFORE, Landlord demands judgment against Lennox AES for compensatory damages in an amount to be proven at trial, attorneys' fees and expenses under Sections 23 and 32(b) of the Lease, interest, and costs.

**COUNT II**
**Specific Performance and Injunctive Relief — Section 7**

99. Landlord adopts and incorporates the allegations of Paragraphs 1 through 91 as if fully set out here.

100. Section 17(b)(iv) authorizes Landlord to "sue for injunctive relief" for Lennox AES' breach.

101. Money damages are not an adequate remedy. AEI reported multiple leaks in the manufacturing roof, and every month of delay risks further damage to the structure and building systems that Landlord owns and will receive back at the end of the term.

102. In the alternative, Landlord is entitled under Sections 7 and 17(b)(i) to enter the Leased Premises, perform the maintenance, repairs, and replacements Lennox AES has failed to perform, and recover the full cost from Lennox AES on demand as Additional Rent.

WHEREFORE, Landlord requests that the Court order Lennox AES to perform the emergency repairs to the manufacturing roof within thirty days, to perform the Short Term Items on a schedule set by the Court, and to deliver a written plan and schedule for replacement of the manufacturing roof within the period identified in the PCR. In the alternative, Landlord requests that the Court declare its right to perform that work under Sections 7 and 17(b)(i) and to recover the cost from Lennox AES as Additional Rent, with the late charge and interest provided in Section 3(e). Landlord also requests attorneys' fees and expenses under Sections 23 and 32(b), and costs.

**COUNT III**
**Declaratory Judgment — Section 7**

103. Landlord adopts and incorporates the allegations of Paragraphs 1 through 91 as if fully set out here.

104. An actual and justiciable controversy exists between Landlord and Lennox AES. Lennox AES contends that it is not responsible for any condition that existed before October 25, 2023, that Landlord must prove the date each condition arose before Lennox AES must act, and that responsibility for the work identified in the PCR must be negotiated. Lennox AES further reserves a right to offset the cost of the repairs it is now performing against other future repairs. Landlord contends that Section 7 places all of that work on Lennox AES. Lennox AES restated its position in the October 23 Letter, asserting that Section 7 does not reach "conditions inherited at the outset."

105. The controversy concerns the manufacturing roof repairs and upcoming replacement, the Short Term Items, and Lennox AES' continuing obligations for the remainder of the term. A declaration will settle the parties' obligations and avoid repeated litigation as each condition comes due.

WHEREFORE, Landlord requests that the Court enter a declaratory judgment that:

(a) Section 7 obligates Lennox AES, at its sole cost and expense, to maintain, repair, and replace all portions of the Leased Premises, including the manufacturing roof and the conditions identified in the PCR, regardless of when any condition first arose;

(b) replacement of the manufacturing roof during the Lease term is Lennox AES' obligation under Section 7;

(c) Landlord has no obligation to maintain, repair, or replace any portion of the Leased Premises except as provided in Section 12;

(d) Lennox AES' failure to perform the work identified above is an Event of Default under Section 17(a)(ii);

(e) Landlord may perform any maintenance, repair, or replacement Lennox AES fails to perform after notice, and recover the full cost from Lennox AES on demand as Additional Rent, with the late charge and interest provided in Section 3(e); and

(f) Lennox AES has no right to offset, deduct, or recover from Landlord the cost of any maintenance, repair, or replacement that Section 7 places on Lennox AES, including the work described in Paragraph 79.

Landlord further requests attorneys' fees and expenses under Sections 23 and 32(b), costs, and such other relief as the Court finds just.

**COUNT IV**
**Breach of Lease — Section 8(a) (Unapproved Alterations)**

106. Landlord adopts and incorporates the allegations of Paragraphs 1 through 91 as if fully set out here.

107. Section 8(a) prohibits Lennox AES from permitting structural or non-structural Alterations "unless and until plans therefor have been approved by Landlord in writing."

108. Lennox AES constructed the Alterations without written approval of plans and specifications by Landlord. Lennox AES has not shown that the Alterations were permitted, built by a licensed contractor, or constructed in compliance with applicable building codes.

109. Lennox AES' assertion that the Alterations were undertaken with Landlord's "prior knowledge and approval" does not satisfy Section 8(a). Knowledge is not written approval of plans. Under Sections 26, 32(a), and 32(d), no term of the Lease is waived or modified except in a writing signed by the party to be charged, and no such writing exists. Internal Lennox AES communications among Lennox AES employees are not a writing by Landlord.

110. Lennox AES' breach of Section 8(a) is an Event of Default under Section 17(a)(ii).

111. Landlord has exercised its option under Section 8(a) to treat the Alterations as part of the realty and the property of Landlord. In the October 23 Letter, Lennox AES stated that it "will not contest that election at this time," but it reserved all rights and continues to assert that the Alterations were approved.

112. Landlord does not know whether the Alterations were designed, permitted, and built in compliance with applicable law and building codes, because Lennox AES has not produced the plans, specifications, contractor information, and permits. Under Section 8(a), Lennox AES

must indemnify Landlord against all costs, loss, or expense in connection with the construction or installation of the Alterations.

WHEREFORE, Landlord requests that the Court:

(a) declare that Lennox AES constructed the Alterations in breach of Section 8(a) and that the breach is an Event of Default under Section 17(a)(ii);

(b) declare that, under Landlord's election, the Alterations are part of the realty and the property of Landlord and shall not be removed by Lennox AES;

(c) order Lennox AES to produce to Landlord, within ten days, final plans, specifications, scope of work declarations, foundation drawings, project inspection reports, progress punch list, final punch list, confirmation of punch list completion, warranties, and other relevant documents, the identity of and contract with the general contractor, all building permits, and any certificate of occupancy or permit close-out;

(d) declare that Lennox AES must indemnify, defend, and hold Landlord harmless under Section 8(a) from all costs, loss, or expense in connection with the construction or installation of the Alterations, including any cost to bring them into compliance with applicable law and building codes; and

(e) award Landlord compensatory damages in an amount to be proven at trial, attorneys' fees and expenses under Sections 23 and 32(b), interest, and costs.

**COUNT V**
**Breach of Lease — Section 16(b) (Estoppel Certificate)**

113. Landlord adopts and incorporates the allegations of Paragraphs 1 through 91 as if fully set out here.

114. Section 16(b) requires Lennox AES to execute and deliver an estoppel certificate within fifteen days after receipt of Landlord's written request.

115. Landlord requested an estoppel certificate by letter dated August 26, 2026. More than fifteen days have passed since Lennox AES received the request, and Lennox AES has not delivered the certificate.

116. Lennox AES' failure to deliver the estoppel certificate is a breach of Section 16(b) and an Event of Default under Section 17(a)(ii).

117. Under Section 16(b), Lennox AES' failure is "conclusive upon Tenant that this Lease is in full force and effect and unmodified and that there are no uncured defaults in Landlord's performance hereunder."

WHEREFORE, Landlord requests that the Court declare that, under Section 16(b), Lennox AES is conclusively bound that the Lease is in full force and effect and unmodified and that there are no uncured defaults in Landlord's performance; order Lennox AES to deliver the estoppel certificate within fifteen days; and award Landlord attorneys' fees and expenses under Sections 23 and 32(b), and costs.

**PRAYER FOR RELIEF**

Landlord respectfully requests that the Court enter judgment in its favor and against Lennox AES on each count above, award the relief requested in each count, award Landlord its reasonable attorneys' fees and expenses under Sections 23 and 32(b) of the Lease, interest, and costs, and grant such other and further relief as the Court finds just.

Respectfully submitted,

/s/ Royal C. Dumas
Royal C. Dumas (DUM008)
*Attorneys for Plaintiff JRB 2171 Hwy 229, LLC*

**OF COUNSEL:**
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street (36104)
P.O. Box 270
Montgomery, Alabama 36102-0270
(334) 206-3100
rcd@rushtonstakely.com